## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| T'LANI ROBINSON, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>ADTALEM GLOBAL EDUCATION, INC., formerly known as DEVRY EDUCATION GROUP, INC., a Delaware corporation, DEVRY UNIVERSITY, INC., a Delaware corporation,<br><br>*Defendants.* | Case No.: 1:19-cv-01505-TWT<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff T'Lani Robinson ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, files this Class Action Complaint against Adtalem Global Education, Inc. ("Adtalem" or "AGE"), formerly known as DeVry Education Group, Inc., and DeVry University, Inc. ("DVU") (collectively referred to as "Defendants" or "DeVry") to, without limitation, obtain a declaration that Defendants' actions were unlawful and obtain damages and restitution as further set forth below. Plaintiff alleges the following

1

based upon personal knowledge as to herself and her own acts, as well as investigation conducted by and through her attorneys.

## NATURE OF THE ACTION

1.      At all times relevant herein, Defendants jointly operated the for-profit school, DeVry University. DeVry provides hundreds of classes taught at locations throughout the country. Since at least 2008, Defendants have made numerous deceptive claims regarding their student employment and income statistics. Specifically, Defendants claim that 90% of their students actively seeking employment had careers in their fields of study within six months of graduation (the "90% Placement Claim"). Similarly, Defendants systematically represented that DeVry University graduates obtained jobs with significantly higher incomes than graduates of other colleges or universities (the "Higher Income Claims").

2.      These claims are not meaningless statistics. Rather, as the Department of Education has recognized, for-profit institutions like DeVry use these misleading claims as critical selling points to get prospective students to enroll.[1]

---

[1]      Department of Education, Program Integrity: Gainful Employment, 79 Fed. Reg. 64890-01, 64890 (Oct. 31, 2014) ("[P]rograms are engaging in aggressive and deceptive marketing and recruiting practices. As a result of these practices, prospective students and their families are potentially being pressured and misled into critical decisions regarding their educational investments that are against their interests."); *see also* U.S. Gov't Accountability Office, GAO-10-948T, Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices (2010).

Using high-pressure sales tactics to leverage these statistics, DeVry is able to charge significantly more for its services than other universities,[2] even though its students—even those who graduate—are no more likely to land a job than those who didn't go to college.[3]

3.      This enrollment model is crucial to DeVry's success. Because DeVry derives the vast majority of its income from federal financial aid programs, it is incentivized to get as many students to enroll, take out loans, and make as many tuition payments as possible. If—and more likely, when—those students do not graduate or find jobs, the former students are stuck with crippling debt, while DeVry simply gets other unwitting prospects to buy into its 90% Placement Claim and Higher Income Claim and enroll in those former students' places. Simply put, DeVry's business model is built on boosting its initial enrollment numbers, not its students' long-term success. The 90% Placement Claim and Higher Income Claims reflect this myopic focus.

---

[2]      79 Fed. Reg. at 64907.

[3]      Rajeev Darolia, *Do Employers Prefer Workers Who Attend For-Profit Colleges? Evidence from a Field Experiment*, National Center for Analysis of Longitudinal Data in Education Research (Aug. 2014), https://caldercenter.org/sites/default/files/WP-%20116.pdf; Julian T. Miller, *Program Integrity and the Implications of the Corporate Identity in Higher Education*, 7 Brook. J. Corp. Fin. & Com. L. 509, 526 (2013) (noting Department of Education's concern that "higher tuition costs at for-profit universities provide[] no return through gainful employment.").

4.      In early 2016, however, it was publicly revealed that Defendants' 90% Placement Claim and Higher Income Claims were false. Unfortunately, tens of thousands of students and consumers reasonably relied on these claims and enrolled in DeVry, borrowing millions of dollars' worth of student loans to purchase educational services and products from Defendants, when—had they known the truth behind Defendants' claims—they would have paid substantially less for their enrollment or wouldn't have enrolled at all.

5.      Plaintiff Robinson, and the students and consumers she seeks to represent, are victims of DeVry's predatory practices. They have read and heard DeVry's 90% Placement Claim and Higher Income Claim, and subsequently purchased Defendants' educational services and products in reliance on the truth and accuracy of these claims, unaware that they were false and unsubstantiated. Had they known the truth of these statements, they would not have enrolled at DeVry or would have paid less to do so.

6.       Accordingly, Plaintiff, on her own behalf and on behalf of a class of similarly situated individuals, brings this lawsuit and seeks injunctive relief, damages, and restitution, together with costs and reasonable attorneys' fees, the calculation of which will be based on information in the possession of Defendants.

## JURISDICTION AND VENUE

7.     This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because: (a) at least one member of the putative Class is a citizen of a state different from DeVry; (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; (c) the proposed Class consists of more than 100 Class Members; and (d) none of the exceptions under the subsection apply to this action.

8.     This Court has personal jurisdiction over Defendants because: (a) they are registered to, and in fact do, conduct business in Georgia; and (b) they have sufficient minimum contacts in Georgia, or otherwise intentionally avail themselves of the markets within Georgia through the promotion, sale, marketing, and distribution of their products and services, to render the exercise of jurisdiction by this Court proper and necessary.

9.     Venue is proper in this District under 28 U.S.C. § 1391 because: (a) Plaintiff Robinson is a resident of, and domiciled in, this District, (b) Defendants conduct substantial business in this District, and (c) a substantial part of the events giving rise to Plaintiff's claims alleged herein occurred in this District.

## PARTIES

10.     Plaintiff T'Lani Robinson is a natural person and citizen of the State

of Georgia, residing in Decatur, Georgia.

11.    Defendant Adtalem is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 500 West Monroe Street, Chicago, Illinois. Adtalem transacts business throughout this District, the State of Georgia, and across the United States. At all times material to this action, acting alone or in concert with others, Adtalem (including when it was known as DeVry Education Group, Inc.) has advertised, marketed, distributed, or sold educational products and services to consumers and students in Georgia and nationwide, and with respect to the acts and practices of DVU that are described herein: (a) dominated and controlled DVU's acts and practices; (b) knew and approved of DVU's acts and practices; and (c) benefitted from DVU's acts and practices.

12.    Defendant DVU is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3005 Highland Parkway, Downers Grove, Illinois. At all times relevant herein, DVU was a subsidiary of Adtalem, formerly known as DeVry Education Group. DVU transacts business throughout this District, the State of Georgia, and across the United States. At all times material to this action, acting alone or in concert with others, DVU advertised, marketed, distributed, or sold the educational products

6

and services to consumers and students in the State of Georgia and throughout the United States.

13.     At all times mentioned in the causes of action alleged herein, each and every Defendant was acting in concert with, and/or was an agent and/or employee of each and every other Defendant. In performing the acts and/or omissions stated herein, each and every Defendant was acting within the course and scope of a common enterprise and was acting with the consent and authorization of each of the remaining Defendants. All actions of each Defendant as alleged in the causes of action stated herein were ratified and approved by every other Defendant and/or its officers or managing agents.

## COMMON FACTUAL ALLEGATIONS

14.     Adtalem is a for-profit education company with a market capitalization of nearly $3 billion and total annual revenues approaching $2 billion, or $168,000 per employee. The marketing and sale of for-profit educational goods and services is big business, and AGE is one of the biggest.

15.     At all times relevant herein, Adtalem owned and operated DVU.[4]

---

[4]     Adtalem announced on or about December 5, 2017 that it had signed an agreement to transfer ownership of DeVry University and its Keller Graduate School of Management to Cogswell Education LLC. This transaction was recently completed in December 2018.

Together, as DeVry, they collectively comprise nearly 60 campuses in the United States, including 5 in Georgia, and an online division that offers 10 certificate, diploma, and degree programs with over 30 concentrations in health care, business, and technology, to name a few.

16.     As a for-profit institution, enrollment growth is critical to DeVry's success for several reasons. First, DeVry's high attrition rate means that it needs to replace its income from tuition paid by students who enroll but subsequently leave its program. For example, DeVry's 2014 graduation rate for the 2008 first-time, full-time entering class to which the graduation rate applies was only 32%. (*See* Exhibit A, attached hereto). Increasing enrollment ensures that DeVry covers its tuition losses from those students that don't graduate.

17.     Second, nearly every student that enrolls provides a new revenue stream to DeVry in the form of federal loans. Historically, DeVry has derived nearly 80% of its revenues from Title IV federal education funds, such as the Pell grant, Stafford loan, and Veterans Affairs education programs, which assist students in paying for higher education. According to the U.S. Department of Education, DeVry received more than $1 billion in taxpayer dollars through federal

student aid in 2015 alone.[5]

18.     Finally, increasing enrollment rates—and thereby its bottom line—also ensures that DeVry meets the revenue and profit projections that its investors expect. As a publicly-traded, for-profit education company, it must consistently show enrollment growth, which is a closely watched metric by Wall Street analysts.

19.     To ensure DeVry meets its enrollment goals, DeVry spends hundreds of millions of dollars each year (*e.g.*, $264 million in 2015) advertising, marketing, recruiting, and promoting DeVry's job placement and post-graduate income claims. To that end, DeVry employs a large sales and recruiting staff to promote its "graduate outcome" claims through a variety of mediums. In 2010, for example, DeVry's recruiting staff outnumbered its career counselors by a factor of ten.

20.     These recruiters are trained to use an approach called "the value proposition of the program," which emphasizes the value of the program against

---

[5]     To underscore that DeVry's focus is on the up-front enrollment of students, and not their long-term success, consider that DeVry students cumulatively hold $8.3 billion in student debt—the fourth highest debt volume of any higher education institution in America—and have a 2009 five-year cohort default rate of 43%. This means that approximately $3.6 billion in revenues that DeVry received from students in the form of federal student loans is now either in forbearance or in default. *See* Department of Education, Program Integrity: Gainful Employment, 76 Fed. Reg. 34386-01, 34387 (June 13, 2011) ("The revenues of these institutions are dependent on the number of students they enroll in their programs; they are not otherwise dependent on whether their students graduate, find jobs, and ultimately repay their loans.").

the cost to the student. For example, by emphasizing that a DeVry education is likely to get the student a job in his or her chosen field or a higher income when he or she starts, the high price of an education at DeVry is downplayed and pitched as a more reasonable investment. Critically, prospective students can only make informed choices about whether the benefits of the program outweigh its costs if the representations—the supposed "value" the education provides—are true.

21.    The form Enrollment Agreements that each DeVry student signed when enrolling in any DeVry program promised that the post-graduation information DeVry provided students—information on which prospective students based the "value" of a DeVry education—were complete and accurate. Thus, by its own promises and material representations, DeVry's statements regarding employment and income rates are supposedly accurate, complete, and meant to be relied upon.

22.    Specifically, DeVry made the following promises in its form Enrollment Agreement:

**Accurate Information Disclosure**

DeVry publishes accurate information about its programs, policies, services, and graduate outcomes. Complete, accurate information is provided on our website, In [sic] our catalogs, and in advertisements and other materials published by DeVry.

### Career Services

DeVry's graduate employment statistics do not include graduates who do not actively participate in an employment search.

(*See* Exhibit B, attached hereto.)

## Defendants' 90% Placement and Higher Income Claims Are False and Misleading

### *Defendants' 90% Placement Claim*

23.    DeVry heavily advertised and promoted its false and misleading 90% Placement Claim despite the fact that it knew the true placement rate and graduate employment statistic for graduates that had completed its programs and obtained employment was much lower. (*See* Exhibit C, attached hereto).

24.    The true statistics for DeVry's graduate outcomes are abysmal, rendering DeVry's promotional and advertising statements false, misleading, and inaccurate. DeVry's true gainful employment rate and graduate employment statistic for the years 2008–2014 has been pegged to be between 20% (or less) and 50%.[6]

---

[6]    Study after study has concluded that graduates of for-profit institutions like DeVry are no more likely to find a job than those with a degree from non-profit postsecondary schools or without any degree at all. *See, e.g.*, Stephanie Riegg Cellini and Nicholas Turner, *Gainfully Employed? Assessing the Employment and Earnings of For-Profit College Students Using Administrative Data*, J. Hum. Resources, Jan. 30, 2018 (forthcoming Spring 2018) (finding students graduating non-profit institutions fare better than those attending for-profit institutions on nearly every economic measure); David Deming, et al., *The For-Profit Postsecondary School Sector: Nimble Critters or Agile Predators?*, 26(1) J. Econ. Persp. 139–64 (Winter, 2012)

25.    To make their promotional and advertising claims, Defendants use information they obtain from students and third parties about students' majors, graduation dates, their employment, and DeVry's classifications of their employment status. Defendants used and manipulated these records to misleadingly calculate the false 90% Placement Claim.

26.    The data, records, and information used by Defendants to make the 90% Placement Claim do not provide a reasonable basis that substantiates Defendants' claims. Defendants improperly counted a substantial number of DeVry graduates as having been placed successfully (*e.g.*, those who were employed when they enrolled and who never actively participated in an employment search). Similarly, Defendants excluded a substantial number of graduates in the pool of those actively seeking employment who should not have been excluded and have been doing so for decades. For example, Defendants count graduates who did not obtain a job as a result of obtaining a degree from DeVry, and include DeVry graduates who after graduation continued with the same job they had when they enrolled in DeVry. As one internal letter to DeVry's president

---

(finding for-profit graduates faced higher levels of unemployment than non-profit schools). Similarly, a Boston University study found that graduates of for-profit institutions were less likely to be employed after leaving their programs than graduates of similar public university programs. Despite the results of these studies, Defendants have consistently pushed an alternative narrative, insisting that 90% of its graduates have jobs in their chosen fields within six months of graduation.

explained, "[r]emoval of these graduates from our numbers has given us the opportunity to present a much higher percentage of placed students." *See* Figure 1, below.



**Figure 1.**

27.     Defendants also unreasonably count jobs that employers, industry experts, graduates, and consumers would not reasonably consider to be in the graduate's field of study and exclude students as "inactive" who were in fact seeking jobs (*i.e.*, reviewing jobs in the DeVry database, attending job interviews, attending DeVry career fairs, actively applying for positions, and actively following up with prospective employers). The actual percentage of DeVry graduates who, at or near the time they graduated, found jobs that could be reasonably considered "in their field" is in fact significantly and materially smaller than 90%.[7]

---

[7]     Many of the graduates themselves do not consider themselves as employed in their field of study when reporting to DeVry, but Defendants misrepresent them as employed in their field, including without limitation in the class of 2012: (1) graduates with degrees in technical management who were working as (a) a rural mail carrier (human resources concentration); (b) a yard salesman at a nursery (business information systems concentration); (c) a sales associate at Macy's (general technical concentration); (d) a driver delivering rain gutters for a construction services company; (e) a data entry specialist for a radio station (human resources concentration); and (f) unpaid volunteers at medical centers (human resources management and health services management concentrations); (2) a graduate with a degree in business administration (health services management concentration) working as a server at the Cheesecake Factory; (3) a graduate with a degree in business administration (health care management concentration) working as a car salesman; (4) a graduate with a degree in business administration (accounting concentration) working as a secretary at a prison; and (5) graduates with various degrees working as customer service representatives. Thus, even in situations where DeVry relies on self-reported employment data—i.e., a person reports finding a job as a mail carrier—DeVry nonetheless may misclassify that data by considering it a job within a student's field of study—i.e., misclassifying the mail carrier job as within that student's technical management degree field—to bolster its 90% Placement Claim.

28.     One DeVry employee who worked in DeVry's career services office at the Sherman Oaks campus in or around 2015 and 2016 stated that DeVry employees there were given lists of upcoming graduates and would continue to check in with them for the six months following graduation. This employee's job responsibilities in the career services office include sending emails to the upcoming graduating class and reviewing students' resumes. This employee confirmed that if students received a job—any job, regardless of whether they had that job prior to attending DeVry, whether it was in their field of study, or whether it was full time—they would be counted in the 90% Placement Claim. If they did not have a job, they would not be considered for purposes of calculating the claim. The career services worker stated that there was no follow-up or incentive to work with graduates after six months had elapsed since their graduation.

29.     As a result of Defendants' practice of recruiting based on fraudulent graduate-outcome statistics, a number of governmental and private entities have filed suit against or investigated DeVry, including the Federal Trade Commission, the Department of Education, and states' Attorneys General.

30.     Plaintiff, through counsel, has diligently attempted to obtain additional information and evidence demonstrating the falsity of the 90% Placement Claim, including by filing Freedom of Information Act requests to

obtain information regarding DeVry's employment statistics from the following entities that have litigated or investigated DeVry: (i) the Department of Education; (ii) the Federal Trade Commission; (iii) the New York Attorney General; (iv) the Massachusetts Attorney General; and (v) the Illinois Attorney General. Plaintiff, through counsel, has also spoke to a former DeVry career services office employee. Despite Plaintiff's diligence, the years'-long process to obtain information from these entities remains ongoing, with only a very limited set of documents being produced. Aside from the limited information obtained from this narrow production, (*see, e.g.*, Figure 1, above), and from speaking to a former DeVry employee (*see* Para. 28, above), all of the necessary information and evidence regarding the falsity of the 90% Placement Claim—for example, additional data besides the examples included here, (*see* Para. 27 & n.9), that substantiates the disconnect between DeVry graduates' and their actual job placement rates—lies exclusively within DeVry's knowledge and control.

31.     Indeed, as demonstrated by the fact that DeVry Education Group, Inc. (Adtalem's predecessor) requested this information be hidden from public view when it was provided to the government, (*see* Figure 1, above), Defendants did

their utmost to prevent the mechanisms of their fraud from becoming known.[8] In addition, Defendants have entered protective orders in the myriad lawsuits their fraudulent conduct has led to that have proceeded into discovery, preventing Plaintiff from citing any DeVry-created documents that may have been filed providing further evidence of Defendants' strategy to manipulate its graduation statistics. *See, e.g.*, *Fed. Trade Comm'n v. DeVry Educ. Grp., Inc.*, No. CV-16-00579-MWF-SSX, Dkts. 73, 74 (C.D. Cal. Aug. 24, 2016).

32.     Following the resolution of multiple lawsuits initiated by regulatory bodies against DeVry, Defendants were ultimately enjoined from making the 90% Placement Claim as part of their advertising.[9] When it was no longer able to make the Claims, DeVry reduced its tuition prices for new students applying to certain bachelor's degree programs by as much as 20%, and began phasing out other programs.

---

[8]     Defendants also entered into confidentiality agreements with governmental regulators, including the Illinois Attorney General, limiting the information that could be produced under FOIA. These confidentiality agreements ensure that, absent court order (i.e., a subpoena) requiring production, responsive information remains undisclosed.

[9]     Neither Plaintiff Robinson nor any of the putative Class Members did discover or could have discovered with any amount of reasonable diligence the true facts regarding DeVry's misrepresentations until January 27, 2016 at the very earliest, when the FTC Lawsuit was filed. Therefore, Plaintiff's and the Class Members' claims are within any applicable statutes of limitations.

### *Defendants' Higher Income Claims*

33.    DeVry has also made false, deceptive, and unfair Higher Income

Claims about the median income levels of its graduates, representing that a DeVry

degree statistically results in higher incomes than comparative programs.

Defendants have made these claims repeatedly and in a systematic manner since at

least 2008.

34.    Defendants falsely represented that DeVry graduates could earn more

than four-year college students starting their careers. Specifically, Defendants

publicly represented that, one year after graduation, DeVry graduates on average

earn 15% more than graduates obtaining bachelor's degrees from other colleges

and universities. The true fact is that DeVry students do not earn more one year

after graduation than four-year college students do in the same one-year after they

graduate.

35.    In using and manipulating false graduate outcome information to

make their 90% Placement Claim, Defendants also falsely misrepresented and

artificially inflated the average annual compensation of its graduates by: (a)

improperly counting a substantial number of DeVry graduates as having been

placed successfully (*e.g.*, those who were employed when they enrolled, who never

actively participated in an employment search, and who generally earn more than

graduates who accept employment after graduation); (b) improperly excluding a substantial number of graduates in the pool of those actively seeking employment, who should not have been excluded, and who had zero income from education-related positions; (c) improperly counting graduates who did not obtain a job as a result of obtaining a degree from DeVry; and (d) improperly including DeVry graduates who after graduation continued with the same job they had when they enrolled in DeVry and who generally earn more than graduates who accept employment after graduation.

36.     In order to further bolster their deceptive Higher Income Claims, in 2012 Defendants hired a third-party company to obtain income data from students who had graduated from DeVry and other schools in 2010. DeVry then used and manipulated the data for marketing purposes. In using the Higher Income Claims in its advertisements and sales pitches, DeVry knew, or should have known, the reliability of the conclusions and information contained in the income report was contradicted by its own data. For instance, the third-party information did not account or adjust for material differences in age, experience, and field of study.

37.     Further, DeVry's own income statistics that it routinely collected annually and directly from thousands of its own graduates materially differed from the third-party report, which consisted of a sample size of only several hundred

individuals per year. As such, DeVry was on notice that the third-party data was not reliable or representative. And Defendants knew or should have known the conclusions and information contained in the income report were false because the methods and methodology of the survey that underlay the income report were questionable.

38.     Due to the flaws in the third-party survey, Defendants' reliance on the third-party data for its Higher Income Claims was unreasonable, and Defendants knew or should have known that their Higher Income Claims and representations were false and unreliable. Indeed, based upon internal and external data, DeVry knew that its graduates did not in fact earn 15% more than other bachelor's degree graduates from all other schools.

39.     As described in Paragraph 30, Plaintiff has diligently sent Freedom of Information Act requests to a number of governmental entities investigating or litigating against DeVry, seeking information regarding the Higher Income Claims. Despite these attempts, all of the necessary information and evidence regarding the falsity of the Higher Income Claim—for example, DeVry's internal reporting on its graduates' salaries, its method for "comparing" that income to other schools' graduates' incomes, and how it used any data obtained from third parties—lies exclusively within DeVry's knowledge and control.

**Defendants Widely Disseminated the 90% Placement and Higher Income Claims**

40.    Since at least 2008, DeVry has represented, expressly or by implication, in television commercials, on its websites, in telephone and face to face sales pitches with prospective students, in brochures and print advertisements, in social media advertisements, in radio ads, and in other advertising and promotional materials two specific claims: (a) as a result of obtaining a DeVry degree, 90% of its graduates, from a specific year (*e.g.*, 2012) or during a specific period (*e.g.*, since 1975 or "for more than 30 years") who were actively seeking employment obtained new jobs in their fields of study within six months of graduation; and (b) DeVry's graduates earn more than graduates from other colleges and universities as a result of obtaining their degrees from DeVry.

### *Defendants Engaged in False Advertising Via the Internet, Print Media, Television, and Radio*

41.    Since at least 2008, Defendants have made their 90% Placement Claim in numerous television advertisements in both English and Spanish. These advertisements have run on national broadcast, satellite, and cable channels and stations, and some have run on DeVry's YouTube channel.

42.    Defendants' statements, made verbally and/or in writing, included: (a) "In 2012, 90% of DeVry University grads actively seeking employment had

careers in their field in six months."; (b) "90% of our grads actively seeking employment had careers in 6 months."; (c) "Join the 90%. Learn how at devry.edu."; (d) "The offer letter. If you're going to college, or back to college, that's your bull's-eye. It is for DeVry University students. In fact, for more than thirty years, 90% of all graduates in the active job market had careers in their fields within six months. 90%."; (e) "This is the guy ready for a great career in technology. 90% of our grads actively seeking employment had careers in 6 months."; and (f) "90% of DeVry University grads actively seeking employment had careers in their field in six months. Learn how at devry.edu."

43.    Since at least 2008, Defendants have made their 90% Placement Claim and Higher Income Claims on various DeVry webpages, including without limitation on the DeVry website, at www.devry.edu.

44.    Examples of the claims made on such webpages include:

- "**Excellent employment results.** Nobody wants to go to college and just be a number . . . unless they're numbers like these. Each year, thousands of our grads find themselves right where they want to be – employed in their fields of study.";

- "**Do DeVry University graduates get good jobs?** Employers want DeVry University graduates. More than 90% of our new graduates quickly land jobs in their fields of study within six months of graduation (learn more). This is a true testament to the fact that DeVry University teaches what companies are looking for. . . . DeVry University graduates leave school well-

prepared to enter the workforce and begin contributing immediately."; and

- **"Outstanding Career Services** - In addition to a relevant education and a highly respected degree, DeVry University offers invaluable career services that have helped thousands of students begin rewarding careers in their fields. The proof is the numbers. Since 1975, 265,869 undergraduate students have graduated from DeVry and 90% of those in the active job market were employed in career related positions within six months of graduation."

45.     Defendants have also disseminated promotional representations through DeVry's public Twitter page at twitter.com/DeVryUniv. For example, on September 14, 2009, DeVry tweeted, "For over 30 years, 90% of all DeVry graduates in the active job market had careers in their fields within six months: http://bit.ly/hyYns." And on July 29, 2013, it tweeted, "90% of #DeVry grads active in the job market find employment in their field of study within 6 months. @DeVryUniv president Dave Pauldine."

46.     Defendants have made similar 90% Placement Claims in print advertisements, handouts to prospective students, brochures, and academic catalogs. In the 2008–2009 DeVry Academic Catalog, DVU President David J. Pauldine represented:

[S]ince 1975, DeVry has graduated more than 230,000 students at the undergraduate level. Of graduates in the active job market, 90 percent were employed in career-related positions within six months of

graduation. It's no wonder we say with conviction that at DeVry, we major in careers.

In the 2009–2010 DeVry Academic Catalog, Mr. Pauldine represented:

> For over 30 years, of DeVry graduates in the active job market or already employed, 90 percent have enjoyed careers in their field of study within six months of graduation.

### *Defendants Engaged in False Advertising Via Internal Sales Pitches and Slide Shows*

47.    DeVry's marketing and sales involve both inbound and outbound campaigns. DeVry's inbound campaign involves disseminating promotional and advertising materials to generate phone calls to DeVry from prospective students, while DeVry's outbound campaign involves DeVry sales personnel making "cold" calls and lead-generated calls to prospective students.

48.    Through either method, prospective DeVry students typically have multiple conversations with DeVry sales representatives that follow set and predetermined scripts. During the course of these phone calls, Defendants make statements and representations as set forth herein to induce prospective students to enroll for a DeVry education program. These scripts were centered around the 90% Placement Claim and Higher Income Claims, and were purportedly approved by Defendants' upper management for use in recruitment conversations.

49.    Since at least 2013, DeVry's sales staff have been trained to inform prospective students via written scripts that "The DeVry University difference includes outstanding career outcomes—In 2012, 90% of DeVry University grads actively seeking employment had careers in their field within six months of graduation."

50.    Prospects are invited to one or more interviews that take place either in person on a DeVry campus or by telephone. Prospective students who are interested in attending a DeVry campus are invited to take a tour followed by an interview with a DeVry "Admissions Advisor." Likewise, prospective students for an online degree are invited to have one or more telephonic interviews with an Admissions Advisor.

51.    Although titled "Admissions Advisors" (or "enrollment advisors," "financial advisors," or "enrollment counselors") an internal document makes clear the job function of these DeVry employees: "This is a sales position." As one salesman (who was told to represent himself as a "military adviser" to veterans) said, it was critical to get "asses in classes."

52.    During the campus tour, some prospects are fed lunch, shown a graduation uniform, or photos of a mock graduation are taken with the prospects wearing the graduation uniform. For the interview stage of the sales pitch,

Defendants provide the Admissions Advisors and salespeople with training guides, scripts, and other guidelines instructing Admissions Advisors on how to pitch the prospects. DeVry Admissions Advisors are also armed with a PowerPoint slide presentation to use during the interview. When the interview takes place by telephone, the prospective student may be directed to a website that allows the prospect to go through a slide presentation with the Admissions Advisor.

53.    DeVry's Admissions Advisors represent during interviews with prospective students that one of the benefits of obtaining a DeVry degree is that, as a result of attaining that degree, 90% of DeVry graduates obtain jobs in their field soon after graduating. The training guide and scripts instruct the Admissions Advisor to tell the prospect, "[a]s a result of these types of career assistance our graduates have shown excellent career results, let's take a look at those." The prospective student is then immediately shown a slide on DeVry's website entitled, "Excellent Employment Results."

54.    This slide includes, without limitation, the following text: "In 2012, 90% of DeVry University graduates from all programs who actively sought employment had careers in their field of study within six months of graduation. Within that same population: 83% of associate degree graduates had careers in their field – 92% of bachelor's degree grads had careers in their field."

55.    The Admissions Advisors are instructed to "[r]ead the career statistics on the screen verbatim" and to click a link to access "employment statistics." If the interview is conducted in person, the Admissions Advisor provides a paper copy of this information to the prospect.

56.    DeVry Admissions Advisors are told to respond to employment assistance questions from the prospect with a statement that, "DeVry offers career services that include assistance with job searches, resume preparation, practice interviews, career fairs, etc. These services are very successful, as evidenced by our employment statistics."

57.    The Admissions Advisors are also instructed to represent to prospects that one year after graduation, DeVry University grads report earning more than the median earning reported by all other graduates, including the claim that those earning bachelor's degrees would earn 15% more than their peers. DeVry Admissions Advisors are also instructed to ask prospects, "How do you think having a 15% higher median earning helped those students?"

### DeVry Executives Made False Statements

58.    In addition to the misrepresentations made by DVU President David Pauldine, in DeVry Education Group's August 8, 2013 fourth quarter 2013

earnings call, Chief Executive Officer Daniel Hamburger stated without qualification:

> A recent Gallup poll found that the factor adult Americans say is most important in selecting a college is the percent of graduates who find a good job. And this is what DeVry University does. *The latest numbers are in, and DeVry University's employment statistics increased more than 90%. 90% of our graduates in the active job market are employed in their field of study within 6 months of graduation, and they're earning an average of over $43,500.* That's higher than the median family household income of our students before they enrolled at DeVry University. [Emphasis added].

59.    Similarly, the core focus of DeVry's 90% Placement Claim and Higher Income Claims is demonstrated in a "Letter to Shareholders" addressed to "Fellow Owners, Students, Colleagues, and Friends" written on or about August 29, 2013, wherein Chief Executive Officer Hamburger stated:

> The best measure of our quality is the successful outcomes that our students achieve. Notably, 90 percent of DeVry University's 2012 graduates active in the job market were employed in their fields of study within six months of graduation, earning an average of more than $43,500 annually.

He went on to represent:

> PayScale recently validated the ROEI [return on educational investment] of DeVry University, ranking three campuses in the top 100 list of PayScale's annual College Return on Investment Report.

60.    DeVry's emphasis on its 90% Placement Claim and Higher Income Claims is also demonstrated in its 10-K filing with the U.S. Securities and

Exchange Commission ("SEC") for its fiscal year ending June 30, 2013, where

DeVry stated:

> DeVry University's highly integrated brand initiative *focuses on the university's graduate employment success,* while emphasizing DeVry University as an accredited, highly-respected academic institution. The brand campaign is grounded in ongoing in- depth consumer, marketplace and brand research, and leverages a number of channels, including broadcast, print and Internet advertising, public relations, and social media, as well as local marketing efforts." [Emphasis added].

61.    DeVry went on to represent:

> One measure of success is the employment outcomes of DeVry University graduates. Each year, thousands of DeVry University graduates have started careers in their chosen fields within 6 months or less of their graduation. Ninety percent of DeVry University's calendar 2012 graduates in the active job market were employed in their fields of study within six months of graduation at an average salary of $43,539. These statistics include graduates of associate and bachelor's degree programs and those who were already employed in their field of study.

## PLAINTIFF T'LANI ROBINSON'S EXPERIENCE

62.    Plaintiff T'Lani Robinson is a resident of Decatur, Georgia. Since at

least 2010, Plaintiff had seen DeVry's television ads touting its 90% Placement

and Higher Income Claims as described in Paragraphs 35–37. In or around the

second quarter of 2013, Plaintiff was invited to and attended an in-person tour of

the Decatur, Georgia DeVry campus where she was fed lunch, shown the

graduation uniform, had pictures taken of her in a mock graduation with other

touring prospects, and met with Admissions Advisor Richard Wiggins. Wiggins gave her a sales pitch and a computer presentation. The sales pitch and computer presentation reiterated verbally, on screen, and in writing the 90% Placement and Higher Income Claims, as described in Paragraphs 43–44 and 46–51.

63.     After the tour and initial interview, Plaintiff Robinson was mailed brochures and given student resource guides which contained the 90% Placement and Higher Income Claims substantially similar to those described in Paragraph 40. Thereafter, Plaintiff also had at least three more phone calls with a DeVry Admissions Advisor and/or other sales representatives, including Alexia Derizzio, as well as at least one additional interview at the Decatur campus.

64.     Mr. Wiggins, Ms. Derizzio, and the other DeVry representatives repeated the 90% Placement and Higher Income Claims and assured Plaintiff Robinson the higher cost of the education program would be paid for by grants, scholarships, and financial aid.

65.     Plaintiff Robinson, in reliance on DeVry's false and deceptive 90% Placement Claim and Higher Income Claim, left Georgia Perimeter and enrolled online with DeVry. At that time, Plaintiff and DeVry entered into the Enrollment Agreement wherein DeVry promised that its advertising and information and the

90% Placement and Higher Income Claims were complete and accurate as
described in Paragraphs 21–22. (*See* Exhibit B.) Plaintiff Robinson attended the
DeVry Decatur campus and used the DeVry website in 2013, ultimately spending
more than $17,000 on her DeVry education program, comprised of a $12,000
Parent Plus loan that was paid directly to and converted by DeVry for its own use
and $5,000 in other expenses. Had Plaintiff Robinson known the 90% Placement
and Higher Income Claims were in fact false, she would have paid less for these
products and services, or would not have enrolled at all.

## CLASS ACTION ALLEGATIONS

66.    **Class Definition:** Plaintiff Robinson brings this action pursuant to
Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself and a
"Class" of similarly situated individuals, defined as follows:

> **Class:** All DeVry students who purchased or otherwise paid for and
> received any part of a DeVry education program while residing in, or
> attending a DeVry campus located in, the State of Georgia.

67.    Additionally, Plaintiff Robinson brings this action pursuant to Federal
Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of herself and all Members
of the "Contract Subclass," defined as:

> **Contract Subclass:** All DeVry students residing in, or attending a
> DeVry campus located in, the State of Georgia who: (a) entered into
> an enrollment agreement substantially in accordance with the terms

and conditions of the Enrollment Agreement; and (b) purchased or otherwise paid for a DeVry University, Inc. education program.

68.     The Class and Subclass described in this Complaint may be jointly referred to as the "Class" or "Classes" and proposed Members of the Classes may be jointly referred to as "Class Members."

69.     The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

70.     Plaintiff satisfies the numerosity, commonality, typicality, adequacy, and predominance prerequisites for suing as representative parties pursuant to Rule 23 of the Federal Rules of Civil Procedure.

71.     **Numerosity:** The exact number of Class Members is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. The Classes likely consist of tens, if not hundreds, of thousands of

individuals. Class Members can be easily identified through Defendants' own records.

72.    **Ascertainability:** The Classes are ascertainable through DeVry's records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other consumer breach of contract, unlawful trade practices, and class action controversies.

73.    **Typicality:** Plaintiff's claims are typical of the claims of other Class Members, in that Plaintiff and the Class Members sustained damages that all arise out of Defendants' enrollment agreements, wrongful conduct and misrepresentations, false advertising, and unlawful practices, and Plaintiff and the Class Members sustained similar injuries and damages as a result of Defendants' uniform illegal conduct.

74.    **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Classes, and have retained counsel competent and experienced in complex class actions. Plaintiff has no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiff.

75.     **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Classes, and those questions predominate over any questions that may affect individual Class Members. Common questions for the Classes include, but are not necessarily limited to the following:

a.     Whether the DeVry Enrollment Agreement was a legal, valid, and enforceable contract;

b.     Whether DeVry breached its contractual representations, warranties, promises, conditions precedent, and covenants that its published information about its programs, policies, services, and graduate outcomes provided on its website, in its catalogs, and in advertisements and other materials were complete and accurate;

c.     Whether Plaintiff and the Classes were damaged as a proximate cause or result of Defendants' breaches;

d.     Whether Defendants failed to disclose that Defendants' education program and services were of a lower quality and value than, and not as, expressly represented, warranted, promised, and covenanted;

e.     Whether Defendants had a duty to disclose the truth about its 90% Placement and Higher Income Claims in connection with the DeVry education program and services;

f.     Whether Defendants knew or should have known their practices and representations related to the marketing, labeling and sales of the education program were false, misleading, or confusing;

g.     Whether Defendants are liable for negligence or gross negligence;

h.     Whether Defendants' misrepresentations and omissions about its 90% Placement and Higher Income Claims in connection with the DeVry

education program and services were likely to deceive, confuse, or create a misunderstanding;

i.   Whether Defendants' conduct, practices, and representations related to the marketing, advertising, labeling, and sales of the DeVry education program and services were unfair, deceptive, confusing, misleading and/or unlawful in any respect, thereby violating applicable State and/or common law;

j.   Whether Defendants collected, took, or received monies from student loan proceeds in Defendants' possession and belonging to Plaintiff and the Classes and wrongfully converted such monies to their own use and benefit;

k.   Whether Defendants' practices and representations related to the marketing, labeling and sales of the education program breached conditions precedent in, of, or to the Enrollment Agreement;

l.   Whether Defendants' practices and representations related to the marketing, labeling and sales of the education program breached express warranties;

m.   Whether Defendants' practices and representations related to the marketing, labeling and sales of the education program breached implied warranties; and

n.   Whether Plaintiff and Class Members are entitled to rescission, restitutionary, injunctive, declaratory, or other relief.

**76.    Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by the Class Members will likely be relatively small, especially given the burden and expense of individual prosecution of the

complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the Class Members to obtain effective relief from Defendants' misconduct. Even if Class Members could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered and uniformity of decisions ensured.

## <u>FIRST CAUSE OF ACTION</u>
**Breach of Contract**
**(Against All Defendants on Behalf of Plaintiff and the Contract Subclass)**

77.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

78.    Plaintiff and each Contract Subclass Member entered into a written, uniform Enrollment Agreement and contract with DeVry. Pursuant to the terms of the Enrollment Agreement, DeVry agreed, amongst other obligations, to provide the education program to Plaintiff and Contract Subclass Members who in turn agreed to pay DeVry money in the form of tuition payments.

79.     In the Enrollment Agreement, DeVry contractually represented, warranted, promised, covenanted, made as a condition precedent in, of, and to the Enrollment Agreement with Plaintiff and the Contract Subclass that:

**Accurate Information Disclosure**

DeVry publishes accurate information about its programs, policies, services, and graduate outcomes. Complete, accurate information is provided on our website, In [sic] our catalogs, and in advertisements and other materials published by DeVry.

80.     Defendants incorporated the 90% Placement and Higher Income Claims into the Enrollment Agreement with Plaintiff and the Contract Subclass by reference, by expressly referencing such information and stating that "[f]or comprehensive consumer information, please visit devry.edu/studentconsumerinfo."

81.     Defendants contractually represented, warranted, promised, covenanted, and made a condition precedent in, of, and to the Enrollment Agreement with Plaintiff and the Contract Subclass that:

**Career Services**

DeVry's graduate employment statistics do not include graduates who do not actively participate in an employment search.

82.     Defendants breached their Enrollment Agreement with Plaintiff and the Contract Subclass Members, in that DeVry's representations regarding the 90%

Placement and Higher Income Claims in connection with the information about their programs, policies, services, and graduate outcomes provided on their website, in their catalogs, and in their advertisements and other materials published by Defendants were false, incomplete, inaccurate, deceptive, and unfair. Had Plaintiff and the Contract Subclass Members known the falsity of the 90% Placement and Higher Income Claims made by Defendants in the Enrollment Agreement, they would not have entered into the Enrollment Agreement, would not have paid as much for the education program, if in they would have purchased any products and services from Defendants at all, and would not have taken out student loans and paid monies to Defendants.

83.    Defendants breached the Enrollment Agreement as alleged herein, and Plaintiff and the Contract Subclass have been damaged as a direct and proximate result thereof. Plaintiff and the Contract Subclass are entitled to actual damages in an amount to be determined in this proceeding.

## SECOND CAUSE OF ACTION
### Negligent Misrepresentation
### (Against All Defendants on Behalf of Plaintiff and the Class)

84.    Plaintiff and the Class Members incorporate the above allegations as if fully set forth herein.

85.     The elements of negligent misrepresentation are: (1) the negligent supply of false information to foreseeable persons, (2) such persons' reasonable reliance on that false information, and (3) economic injury proximately resulting from such reliance.

86.     Defendants expressly made the 90% Placement Claim to Plaintiff and the Class, which misrepresented the truth that less than 90% of its graduates actively seeking employment found jobs in their field within six months of graduating. Defendants also made the Higher Income Claim to Plaintiff and the Class, which misrepresented the truth that DeVry graduates' median incomes were not 15% higher than the median incomes of graduates of all other programs.

87.     As these claims were the touchstones of Defendants' recruitment programs, it was foreseeable that Plaintiff and the Class would read, hear, and otherwise become aware of the 90% Placement Claim and Higher Income Claim. To a student considering post-secondary schools, including Plaintiff and the Class, such facts are material; an institution that points to a history of its graduates finding jobs and earning more is a more attractive choice than one that does not historically have such outcomes. Thus, it was equally foreseeable that Plaintiff and the Class would rely on the false information Defendants supplied.

88.     Plaintiff justifiably relied on the 90% Placement Claim and Higher Income Claim to enroll in Defendants' educational programs. After being told time and again these claims, Plaintiff and the Class Members relied on them when deciding to enroll in the Defendants' educational programs. But for the 90% Placement Claim and Higher Income Claim, Plaintiff and the Class Members would not have enrolled.

89.     As a direct and proximate result of their reliance on the misrepresentations in Defendants' 90% Placement Claim and Higher Income Claim, Plaintiff and the Class suffered actual injuries-in-fact and economic damages, incurring student loan debt and paying education related costs that they would not have otherwise incurred and paid. Had Plaintiff and the Class known the truth behind these claims—that the 90% Placement Claim and Higher Income Claim were misrepresentations of DeVry graduates' true employment and income statistics—they would not have enrolled in Defendants programs or would have paid less to do so, if anything.

90.     Plaintiff and the Class seek compensatory damages with pre-and-post judgment interest, the costs of suit, attorneys' fees, and other and further relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION
### Fraudulent Misrepresentation
### (Against All Defendants on Behalf of Plaintiff and the Class)

91.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

92.     The elements of the tort of fraudulent misrepresentation are: (1) a false representation, (2) that the defendant knew was false at the time it was made (3) with the intent to deceive the plaintiff, (4) that the plaintiff justifiably relied on, and (5) suffered damages as a result.

93.     Defendants' representations are false at the time they were made because: (a) the actual percentage of DeVry graduates who, at or near the time they graduated, found jobs that could be reasonably considered "in their field" is in fact significantly and materially smaller than 90%; and (b) Defendants' own statistics showed that graduates of DeVry did not have a higher income than graduates from other schools, and that such claim was false and deceptive.

94.     Defendants knew that their representations were false or made the representations and suggestions recklessly and without regard for their truth. Plaintiff and the Class Members have suffered damages and injury-in-fact the form of, without limitation, liability for student loans, tuition, and other payments for their education program.

95.     Defendants intended Plaintiff and the Class Members relied on the 90% Placement Claim and Higher Income Claim. As described herein, these claims were the basis of Defendants' recruitment efforts and intended to induce prospective students to enroll and purchase Defendants' education program.

96.     Plaintiff and the Class Members justifiably relied on the 90% Placement and Higher Income Claims, and would not have purchased an education program or any other of Defendants' services, or would not have paid as much for them, had they known the truth about the 90% Placement and Higher Income Claims.

97.     As a direct and proximate result of their reliance on Defendants' misrepresentations, Plaintiff and the Class Members suffered actual injuries-in-fact, including by incurring student loan debt and paying education related costs that they would not have otherwise incurred and paid. Had Plaintiff and the Class known the truth behind these claims—that the 90% Placement Claim and Higher Income Claim were misrepresentations of DeVry graduates' true employment and income statistics—they would not have enrolled in Defendants programs or would have paid less to do so, if anything.

98.     Plaintiff and the Class Members are entitled to, and hereby seek, actual damages, punitive damages, treble damages, reasonable attorneys' fees and

costs under, and any and all further equitable relief that this Court deems appropriate.

**FOURTH CAUSE OF ACTION**
**Fraudulent Concealment**
**(Against All Defendants on Behalf of Plaintiff and the Class)**

99.   Plaintiff incorporates the foregoing allegations as if fully set forth herein.

100.   Defendants intentionally and knowingly concealed material facts from Plaintiff and the Class Members that were known only to Defendants prior to Plaintiff and Class Members' purchases of a DeVry education program and related products and services.

101.   Defendants intentionally and knowingly concealed the aforementioned material facts—that the 90% Placement Claim and Higher Income Claims were false and unsubstantiated—from Plaintiff and the Class Members with the intent to induce them to purchase its education program and related products and services.

102.   Defendants had, and have, a duty to disclose the concealed information because Plaintiff and the Class Members did not know of the concealed facts prior to purchasing a DeVry education program and related

services, nor could they reasonably be expected to learn or discover such concealed facts prior thereto.

103.   Plaintiff and the Class Members would not have purchased the education program and related services, nor would not have paid as much therefor, had they known of the concealed information.

104.   Plaintiff and the Class justifiably relied on the facts as they knew them at the time, and as a direct and proximate result of Defendants' fraudulent concealment of material facts, Plaintiff and the Class Members have suffered actual injury-in-fact and damages, including but not limited to, monetary loss in connection with purchases of the education program and related services they would not have purchased absent Defendants' concealment, fraudulent omissions, and non-disclosures, or would not have paid as much for such purchases.

105.   Accordingly, Plaintiff and the Class Members are entitled to, and hereby seek, actual damages, punitive damages, treble damages, reasonable attorneys' fees and costs, and any and all further equitable relief that this Court deems appropriate.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment (In the Alternative to Breach of Contract)
### (Against All Defendants on Behalf of Plaintiff and the Class)

106.   Plaintiff and the Class Members incorporate the above allegations as if fully set forth herein, excluding Paragraphs 21–22 and 72–78.

107.    The elements of unjust enrichment are: (1) receipt of a benefit; and (2) unjust retention of the benefit at the expense of another. Restitution is appropriate to return the aggrieved party to his or her former position.

108.   In reliance on Defendants' 90% Placement Claim and Higher Income Claims, Plaintiff and the Class Members conferred non-gratuitous benefits upon Defendants by paying monies and funds to Defendants for products and services that did not have the characteristics, uses, benefits, and attributes which Defendants advertised, promoted, and represented such products and services had, and Defendants derived profits therefrom.

109.   Defendant accepted or retained such benefits with knowledge that Plaintiff and the Class Members did not know the products and services sold to Plaintiff and the Class did not have the characteristics, uses, benefits, and attributes which Defendants advertised, promoted, and represented such products and services had. Defendant has been unjustly enriched in retaining the revenues from Plaintiff's and the Class Members' purchases of DeVry's products and services,

which retention under these circumstances is unjust and inequitable because

Defendant misrepresented the facts concerning the true characteristics, uses,

benefits, and attributes of such products and services.

110. Plaintiff and the Class Members would not have purchased DeVry's

products and services had they known the characteristics, uses, benefits, and

attributes of such products and services were not as Defendants had advertised,

promoted, and represented them to be. DeVry was unlawfully inducing Plaintiff

and the Class Members to enroll and pay monies and funds to DeVry for financial

gain without their permission or knowledge, and in violation of their consumer

rights

111. As a direct and proximate result of Defendants' false and/or

misleading representations, assertions of fact, omissions of material fact, non-

disclosures, and illegal conduct, Plaintiff and the Class Members have suffered

concrete harm and injury, including, but not limited to, monetary loss in

connection with their purchases of DeVry's products and services, which they

would otherwise not have purchased absent Defendants' unlawful conduct, as

alleged herein.

112. Plaintiff and the Class Members received less than what they paid for

in that the 90% Placement Claim and Higher Income Claims were not true, and the

DeVry education program was not delivered as promised. Had Plaintiff and the Class Members known about the misrepresentations and the true placement rate and income rate, they would not have purchased the education program or any products or services from Defendants, or would have paid significantly less for them, if at all.

113.   Under principles of equity and good conscience, Defendants should not be permitted to retain the profits they receive at the expense of Plaintiff and the Class while failing to have provided them with complete and truthful information regarding the 90% Placement Claim and Higher Income Claims.

114.   Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and the Class Members would be unjust and inequitable. Plaintiff and the Class Members are entitled to seek disgorgement and restitution of wrongful profits, revenue, and benefits conferred upon Defendant in a manner established by this Court.

### SIXTH CAUSE OF ACTION
**Declaratory Relief**
**(Against All Defendants on Behalf of Plaintiff and the Class)**

115.   Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

116.   A court may make binding declarations of the construction of any statutes, and a declaration of the rights of the parties interested by means of a pleading seeking that relief alone, or as incident to or part of a complaint, counterclaim or other pleading seeking other relief as well. Ga. Code Ann. § 9-4-2.

117.   Plaintiff and the Class Members are at a heightened and imminent risk of being financially unable to repay, and in default of, their student loans resulting from Defendants' wrongful and unlawful conduct. Interest on student loans continues to accrue every day, whether such loans are in forbearance or default or not.

118.   Plaintiff and the Class Members are suffering actual and imminent harm that is concrete and ongoing with each passing day of interest. An actual controversy and dispute between Plaintiff and the other Class Members and Defendants exists, and the parties have genuine, direct, and substantial opposing interests for which a judicial determination will be final and conclusive.

119.   Plaintiff and the Student Class Members who took out student loans have a defense against repayment of such loans in any action to collect such loans based on any act or omission of Defendants that would give rise to a cause of action against Defendants under applicable State law. 34 CFR 685.206(c)(1), (2).

120.   To the extent Plaintiff and the Student Class Members are relieved of repayment obligations for student loans based on violations of applicable state law, Defendants are subject to payment of the amount of the loan to which the defense applied. 34 CFR 685.206(c)(3).

121.   Plaintiff and the Class Members are therefore entitled to a declaratory judgment that Defendants' acts and omissions as alleged herein violates applicable State law as well as such other and further relief as may follow from the entry of such a judgment.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all others similarly situated, respectfully requests the Court enter a judgment against Defendants, and grant the following relief:

A.   an order certifying the Class and the Contract Subclass, designating Plaintiff as Class Representative, and designating her counsel of record as Class Counsel;

B.   a declaration that the acts, omissions, and practices described in this claim exist, are unfair, deceptive, unlawful, and a violation of applicable State law;

C.   a declaration that the Enrollment Agreement is an illegal contract and is void *ab initio*;

D.     a declaration that Defendants breached their agreement with Plaintiff and the Contract Subclass;

E.     an order permitting Plaintiff and the Class Members to elect to affirm their contracts or alternatively demand rescission and seek damages;

F.     a declaration that Defendants owed a duty of full, fair, adequate, and truthful disclosure in connection with their education program and other educational products, services, and material;

G.     an award to Plaintiff and Class Members for compensatory, exemplary, punitive, treble, and statutory penalties and damages as allowed by law, including pre-judgment and post-judgment interest, in an amount to be proven at trial;

H.     a declaration that Defendants must disgorge for the benefit of Plaintiff and Classes, all or part of the ill-gotten revenue, gross income, profits, and benefits received from the sale of the education program and/or any other products and services, and make full restitution to Plaintiff and Class Members;

I.     restitution in the amount of monies paid by Plaintiff and Class Members for the education program and any products and services purchased from and sold by Defendants;

J.      an order enjoining Defendants from engaging in further unfair and

deceptive advertising, promotion, distribution and sales practices with respect to

the education program and any educational products and services;

K.      a permanent injunction prohibiting Defendants and their officers,

agents, employees and successors, from engaging in the unlawful practices

complained of herein in violation of applicable state law;

L.      a mandatory injunction requiring Defendants to adopt business

practices in conformity with the requirements of applicable laws;

M.      a declaration that Defendants are financially responsible for notifying

Plaintiff and all Class Members about the true nature of the education program and

Defendants' educational products and services;

N.      an order requiring Defendants to notify Plaintiff and Class Members

that the 90% Placement and Higher Income Claims are false and untrue;

O.      an order imposing a constructive trust upon Defendants such that their

enrichment, benefit, and ill-gotten gains may be allocated and distributed equitably

to and for the benefit of Plaintiff and the Class Members;

P.      an award of attorneys' fees and costs, including expert fees, as

allowed by law;

Q.      leave to amend this Complaint to conform to the evidence produced at

trial; and

R.      such other relief as the Court may deem just, proper, and appropriate

under the circumstances.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: December 9, 2019                     **T'LANI ROBINSON**, individually
                                            and on behalf of all others similarly
                                            situated

                                            */s/* Jennifer Auer Jordan

                                            Jennifer Auer Jordan
                                            (Bar No. 027857)
                                            jordan@sjwtriallaw.com
                                            SHAMP JORDAN & WOODWARD LLC
                                            1718 Peachtree Street NW, Suite 660
                                            Atlanta, Georgia 30309
                                            Telephone: 404.893.9400
                                            Facsimile: 404.260.4180

                                            Benjamin H. Richman*
                                            brichman@edelson.com
                                            Sydney M. Janzen*
                                            sjanzen@edelson.com
                                            Michael Ovca*
                                            movca@edelson.com
                                            EDELSON PC
                                            350 N. LaSalle, 14th Floor
                                            Chicago, Illinois 60654
                                            Telephone: 312.589.6370
                                            Facsimile: 312.589.6378

Robert L. Teel*
LAW OFFICE OF ROBERT L. TEEL
lawoffice@rlteel.com
1425 Broadway, Mail Code: 20-6690
Seattle, Washington 98122
Telephone: 866.833.5529
Facsimile: 855.609.6911

*Admitted *pro hac vice*

*Attorneys for Plaintiff and the Proposed Class*